**NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



**MALA SUNDAR
PRESIDING JUDGE**

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

March 11, 2021

Paul Tannenbaum, Esq.
Zipp & Tannenbaum, L.L.C.
Attorneys for Plaintiff

Martin Allen, Esq.
DiFrancesco Bateman <u>et al.</u>, P.C.
Attorneys for Defendant

> Re:   4304 Route 9 South Realty Corp. v. Township of Freehold
> Block 4, Lot 39
> <u>Docket No. 006919-2018</u>

Dear Counsel:

This letter constitutes the court's decision following trial of the above-captioned matter involving plaintiff and defendant's challenge to the local property tax assessment of $5,081,500[1] for tax year 2018, imposed upon the above referenced property (Subject).

Each party's real estate appraiser (offered and accepted by the court as an expert in real estate appraisal) opined the Subject's value, under the cost approach, as follows:

| **Plaintiff's Appraiser** | **Defendant's Appraiser**[2] |
|:---:|:---:|
| $2,800,000 | $5,630,000 |

There were two significant areas of disagreement between the plaintiff's and the Township's appraiser. One was their conclusion of land value ($1,725,000 versus $3,880,000),

---

[1]  Allocated $1,875,000 to land and $3,206,500 to improvements. Plaintiff's appraiser's report indicates the assessment as $5,006,500 (allocated $1,800,000 to land and $3,206,500 to improvements) however this number does not appear on the Case Information Statement filed by both parties.

[2] Defendant's expert concluded a higher value under the sales comparison approach at $6,020,000, and in his reconciliation placed most emphasis on the valuation conclusion of $5,630,000 under the cost approach.







with each appraiser using different units of comparison (per square foot or PSF of building area vs. acreage). This was mostly due to their comparable selection: plaintiff's appraiser used land sales which were all subsequently used to construct car dealerships. The appraiser for defendant (Township) used sales some of which were developed for retail uses since he opined that land zoned for commercial/retail use would attract competing buyers including car dealerships.

The second area of disagreement was in the depreciation rates used in arriving at the Subject's replacement cost for the improvement. Plaintiff's appraiser used 45% for physical depreciation of the building under the economic age/effective life computation, plus 10% for functional obsolescence, and 65% physical depreciation for site improvements. The Township's appraiser used 20% for physical depreciation for building and site improvements using Marshall & Swift (M&S) developed depreciation tables. There were certain minor differences as well, such as adjustments to vacant land sale prices and plaintiff's appraiser's inclusion of entrepreneurial profit in concluding vacant land value.

For the reasons stated below, the court finds that only two vacant land sales are credible comparables (plaintiff's appraiser's Sale 1 and the Township's appraiser's Sale 2); none of the adjustments made by the Township's appraiser to the sale price of his comparable are supportable; and plaintiff's provision for entrepreneurial profit is not credible. With most weight to the Township's appraiser's Sale 2 which occurred in Monmouth County where the Subject is located, and close to the assessment date, the court finds land value as $950,000 per acre, which when applied to the Subject's area of 3 acres is $2,850,000. The court accepts plaintiff's appraiser's depreciated improvement replacement cost new as his cost data is closer to the assessment date but rejects his 10% provision for functional obsolescence. This equals $1,293,523, which with land value provides a total value of $4,143,525 (rounded).

2

**SUBJECT DESCRIPTION**

Plaintiff owns the Subject which is a $\pm$ 3-acre lot which is improved by a $\pm$18,241 square foot new car dealership that was built in 1989.[3] It is located on the west side of Route 9 which, per plaintiff's appraiser's report, "is dominated by various commercial uses including automobile dealerships and various other commercial uses."

The Subject lies within the CMX-3A (Corporate Multi-Use 3 Acres) zone. This zone permits office and commercial development, amongst various other commercially used properties, and includes "new car dealers" (who/which can nonetheless display used cars up to 30% of the inventory).[4] Further, it includes motor vehicle showrooms, offices, mechanical repair and maintenance facilities.

The Subject has a sanitary sewer easement, about 30' wide, which per plaintiff's appraiser "effectively bisect[s] the subject site and travers[es] more than half of [its] frontage along Route 9." Because of this, and its "relatively small, irregular shaped site," plaintiff's appraiser opined that the Subject is not an ideal location for building a new car dealership. The site has freshwater wetlands towards the rear and along southern property line. Because of this, the Township's appraiser deemed the "useable acreage . . . to be $\pm$ 2.5 acres."

The Subject is improved by a car dealership which is a one-and-part two-story building. On the first floor is the showroom and reception area, individual offices, and restrooms totaling $\pm$ 4,758 square feet (SF). The second floor has a mezzanine area which contains offices,

---

[3] Plaintiff owns 16 car dealerships of different brands in the Tri-State, six of which are in New Jersey, one being the Subject. The other five are in Union and Hudson counties.

[4] Per the zoning requirements, included in both appraisers' reports, the minimum lot area is 3 acres; maximum building coverage is 20%; maximum lot coverage is 65%; maximum building height is 2 stories or 40 feet; and maximum floor-to-area (FAR) ratio is 20%.

breakrooms, and restrooms totaling $\pm$ 1,638 SF.  There is also a storage area on this floor totaling $\pm$ 3,934 SF.

The service garage with eight bays equipped with lifts totaling $\pm$ 7,911 SF is located on the first floor of the building.  Per the Township's appraiser, ceiling height is $\pm$ 22 feet.  Other site improvements include on-site parking for about 150 vehicles, yard lighting, eight pole mounted floodlights in parking area, concrete curbing, landscaping (for $\pm$ 30,000 SF).  There is one loading dock (with an aluminum and steel overhead door).  HVAC is roof-top units.

Plaintiff leases an adjacent vacant lot on a month-to-month basis for additional storage of its cars.  Its appraiser agreed that it is not atypical to lease/use other property for storage of additional inventory (cars), and it is more convenient when the other property is adjacent to the dealership as opposed to being offsite.

The building was constructed in 1989.  Per Plaintiff's appraiser, renovations were done to portions of the office and service area post-valuation date in 2018 (at a cost of $139,732.34), and to the showroom in 2019 (at a cost of $112,020).  Per the Township's appraiser, the façade and showroom were renovated in 2006.  Plaintiff's owner confirmed that the Subject did not undergo any renovations prior to the valuation date of October 1, 2017.  He noted that in 2006, due to request from the car manufacturer, plaintiff had to construct a change to the fascia by building an arch in the entrance to the car dealership's building at a cost of about $100,000, but no renovations or alterations were made to the showroom or service area.

Both appraisers deemed the improvements to be of average condition and quality.  Only Plaintiff's appraiser opined that the Subject's improvements were also functionally obsolete since (a) they were typical of an older dealership lacking "modern features such as a new car delivery area and car wash," thus needed an "overall renovation/modernization program," and

4

(b) due to the "inadequately undersized exterior parking area."[5]   He also opined the site improvements as requiring repair or replacement, with paving showing signs of deferred maintenance.

**ANALYSIS**

(A) PRESUMPTION OF CORRECTNESS

Assessments are presumptively correct.  MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998).  The presumption is "a construct that expresses the view that in tax matters, it is to be presumed that governmental authority has been exercised correctly and in accordance with law."  Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citations omitted).  "The presumption attaches to the quantum of the tax assessment."  Ibid. The burden of overcoming the presumptive correctness is upon the party challenging the assessment's validity.  Ibid.

The court first decides whether plaintiff overcame the presumption, and if so, proceed to evaluate the evidence presented, whether defendant has asserted a counterclaim or not.  MSGW, 18 N.J. Tax at 378.  If there is a counterclaim, and the court has decided that plaintiff overcame the presumption of correctness, then there is no need for the court to separately determine "whether the defendant has overcome the presumption with respect to a counterclaim."  Ibid.

Plaintiff adduced testimonial evidence of the Township's assessor to attempt to call into question the assessment's presumptive correctness by showing that the land allocation of the 2018 assessment for the Subject lacked credible basis.  The Township argued that allocation of the assessment was irrelevant.  The court agrees with the Township.  There was nothing in the

---

[5]  Plaintiff leases a portion of the vacant lot behind the Subject (Block 4, Lot 40) with a parking capacity for 100 vehicles, at $3,250 per month.  Per tax map included in Township's appraiser's report, area of this lot is one acre.

assessor's evidence to allow this court to conclude that the 2018 assessment was so arbitrary or baseless, or imposed without use of any reasonable valuation methodology.

Plaintiff also provided testimony of a real estate appraiser who used only the cost approach, a recognized valuation method. That there could be credibility issues as to plaintiff's appraiser's conclusion of value under the cost approach does not equate to plaintiff's failure to overcome the initial presumption of correctness of the assessment. Plaintiff's proffer of its appraiser's valuation methodology suffices as the required scintilla of cogent and credible evidence which raises a debatable question as to the assessment's correctness.

(B) VALUATION

*(1) Highest and Best Use*

Plaintiff's appraiser opined the highest and best use (HBU) of the Subject as vacant to be for the development of modern one-and-part 2-story automobile dealership. He opined that as ]vacant all of the four criteria would be met in that (1) the zoning allows various commercial uses, thus, a car dealership would be legally permissible; (2) it would be physically possible to build the car dealership on the Subject's site given its existing physical characteristics (size, shape, topography etc.); (3) it is financially feasible to develop the Subject site for uses consistent with the existing zoning; and (4) the site's maximal productivity was decided by "use which would support the highest land value."[6]

As improved, he opined the HBU as its current use because (1) zoning is for various commercial uses including car dealerships; (2) it is physically possible to build a car dealership, the Subject having been constructed in 1989; (3) it is financially feasible since the Subject has

---

[6] There was no analysis of which use "would support the highest land value."

6

been successfully operating as a car dealership since 1989; (4) thus, the use of the Subject as an automobile dealership was the maximally productive use of the site.[7]

The Township's appraiser opined the HBU as vacant to be for a commercial development conforming to CMX-3A zone because it is legally permissible, physically possible, financially feasible since the Subject neighborhood is developed with commercial uses, and maximally productive for a zoning-permitted commercial use. As improved, he opined its HBU as its present use as evidenced by the Subject's existing improvements, and there being an active market for auto dealerships as the Subject.

The court agrees with the appraisers' conclusion that the Subject's HBU as improved is its present use since it checks all the four required boxes (criteria) under the HBU analysis (legally permissible, physically possible, financially feasible, and maximally productive).

*(2) Value Conclusions*

Both appraisers used the cost approach. The Township's expert tested the results under the sales comparison approach but did not rely upon the higher value conclusion it provided because the sales "had some unusual sale conditions and several were heavily renovated after the sales." Cross-examination also showed that he did not verify (or could not recollect verifying) several sales nor knew the details of how the sale price was determined (i.e., whether it included franchise, personal property, goodwill), and one sale was a foreclosure/distress sale.

---

[7] This conclusion was despite his opinion when addressing the Subject's physical characteristics that the Subject's sanitary easement and its "relatively small, irregular shaped site," did not render the site as an ideal location for building a new car dealership.

The court will therefore only examine the cost approach conclusions by both appraisers. Under this approach, vacant land value is first developed, to which is added the depreciated cost of improvements.

(i) Land Value

Land value is determined by "a straightforward sales comparison approach" namely, by analyzing "sales of similar parcels of land" and making required adjustments "to provide a value indication for the land being appraised." Ford Motor Co. v. Twp. of Edison, 10 N.J. Tax 153, 176-77 (Tax 1988), aff'd, 127 N.J. 290. As noted above, plaintiff's appraiser concluded a land value of $1,725,000, while the Township's appraiser's value conclusion was $3,880,000.

Plaintiff's appraiser viewed car dealerships as unique because the sites, location, layout, building construction and other improvements are dictated by franchisors. Therefore, he felt that the only credible comparables would be sales of vacant land which were improved by an automobile dealership. Since such sales are infrequent, he opined, he performed a State-wide search. The six sales were as follows:

| Location (Town/County) | Size (Acres) | Sale Date | Sale Price | Zone | Actual/Planned Building SF | Approvals | FAR | Other |
|---|---|---|---|---|---|---|---|---|
| Maple Shade, Burlington County | 5.22 | 05/13/13 | $3,000,000 | HC- Highway Commercial | 27,693 SF | Subject to | 12.18% | Existing motel demolished for Acura |
| Winslow, Camden County | 20.63 | 01/17/14 | $8,280,000 | HC- Highway Commercial | 44,398 SF | Subject to | 4.94% | Carmax Auto Superstores built |
| West Caldwell Essex County | 6.46 | 11/13/14 | $6,000,000 | B-3 General Business Dist. | 64,000 SF | Subject to | 22.74% | Older Chevy dealership demolished for new state-of-the art Benz dealership |
| Dover, Ocean County | 5.69 | 04/30/15 | $1,800,000 | RHB Rural Hwy Business | 49,470 SF | No | 19.96% | Post-sale, buyer demolished existing structures to build 2-story car dealership |
| South Brunswick, Middlesex County | 10 | 02/16/17 | $2,250,000 | I-3 Industrial | 15,600 SF | Yes | 3.58% | Truck dealership built |
| Robbinsville, Mercer County | 6.681 | 02/21/17 | $2,200,000 | HC- Highway Commercial | 40,323 SF | No | 13.86% | Vacant wooded lot for building Jeep-Chrysler dealership. |

After adjustments for lack of approvals (+30%) and difference in floor-to-area (FAR) at 5% or -10%, the value ranged from a high of $167.84 and a low of $49.13 for a mean of $104.08

PSF of building area. He concluded a value at $90 PSF of building area. This times the Subject's building size (18,241 SF) provided $1,641,690. To this he added 5% as entrepreneurial profit for a total value of $1,725,000.

The Township's appraiser opined that land usable for commercial purposes (he deemed retail use the same as commercial use), which includes a variety of uses including car dealerships, is an appropriate comparable. A car dealership, to him, is a retail business (sale of tangible personal property: cars), therefore, land sales for retail uses, or which were post-purchased improved for retail use, are appropriate comparables. He used the following sales, all located in Monmouth County, as follows:

| Location (Twp) | Size (Acres) | Sale Date | Sale Price | Zone | Actual/ Planned Bldg SF | Approvals | Zoning Approvals | Other |
|---|---|---|---|---|---|---|---|---|
| Eatontown | 4 | 06/15/17 | $4,700,000 | B2 Business | 36,000 SF | | Yes | site was previously approved for a 45,000 SF retail building; buyer, a supermarket chain, sought modification for a 36,000 SF building and reposition the building "envelope." |
| Hazlet | 5.08 | 01/26/17 | $5,800,000 | BH Business Hwy | 36,170 SF | Subject to | No | Same buyer as Sale 1; when sold lot improved by a diner; sold subject to approvals, and with variances for a supermarket; appraiser added estimated demolition cost of $25,000 to sale price |
| Freehold | 2.15 | 09/02/16 | $3,300,000 | CMX-3 | 25,731 SF | | Existing | When sold site had an older Chevy dealership; application for site plan approvals were post-sale for demolition and building a new Chevy dealership. |
| Eatontown | 4.09 | 07/13/15 | $5,550,000 | MB Manufacture Business | 40,246 SF | Subject to | No | When sold was improved with a 22,610 SF Audi car dealership which the buyer obtained approvals to expand |

He adjusted the sale prices for approvals (twice, once as a condition of sale because the sale was "Subject to Approvals" at -10%, and once when sold with no approvals in place at 35%) and for time. The adjusted per-acre sale prices ranged from a high of $1,741,170 to a low of $1,305,425 (with a mean of $1,547,082; and median of $1,570,867). He concluded a value of $1,550,000 per acre which times the Subject's 2.5-acre useable lot area was $3,875,000, which he rounded to $3,880,000.

*Findings*

The issues are the credibility of the (1) chosen comparables; (2) unit of measurement; and (3) adjustments to sale prices.

*Credibility of Comparables*

The court finds unpersuasive plaintiff's appraiser's theory that because the construction and operations of a car dealership are unique, and so fully controlled by a franchisor that the only credible comparables would be vacant land sold for the development of an automobile dealership.[8] More persuasive is the Township's expert's opinion that any commercially usable site which can compete with the Subject, thus for being improved by an auto dealership (provided permissible under the zoning laws), can make a credible comparable. See e.g. Appraisal Institute, The Appraisal of Real Estate 362-63 (14th ed. 2013) ("valuation of land draws directly from the conclusions of [HBU] analysis," thus, the HBU "of a competitive site on the date of sale is the basis of the comparability of that site to the property being appraised"). Also, there is no objective evidence to show that a car dealership is unique such that only certain type of land can be used for its construction. Plaintiff's appraiser's premise that only land sales which were subsequently improved as car dealerships are credible comparables unnecessarily narrows the field of land sales data, unnecessarily forces the use of sales much before the assessment date, and unnecessarily disregards otherwise useable sales in or within the Subject's proximity.

---

[8] If as plaintiff's appraiser claims, car dealerships are built on sites selected solely by the franchisor, the question arises whether there is a willing buyer under no pressure to buy. The Township however did not challenge plaintiff's appraiser's sales as being non-arms-length due to the alleged control by the franchisor. Cf. The Appraisal of Real Estate at 360 (under the principle of substitution which applies to "raw land and developable sites . . . the greatest demand will be generated for the lowest-priced site with similar utility").

10

Plaintiff's appraiser's opinion that only vacant land sales make for more credible comparables is reasonable. However, this does not mean that comparables which were improved when sold and the improvements were demolished for the new construction should be summarily rejected. See id. at 364 (the land sales under the sales comparison approach can be used "to value land that is actually vacant or land that is being considered as though vacant for appraisal purposes"). Here for instance, some comparables used by both appraisers were improved when sold.[9] However, their credibility as comparables depends on facts adduced in support thereof (e.g., are sale terms indicative of non-arms-length dealings; is the price stated as a lumpsum and includes more than realty).

The court will therefore examine the credibility of all proffered comparables. In this connection, both appraisers agreed that proximity to main thoroughfares or highways, with high visibility, and location amongst a "cluster" of other competing car dealerships, and/or shopping centers, are desirable features for an automobile dealership since they all go to increased potential for sales. The Subject enjoys all these features. Locationally, in terms of comparability with the Subject, it is also reasonable to consider the household median income within a taxing district in which the comparable is located versus that in the taxing districts in the Subject's vicinity.[10]

The court rejects plaintiff's appraiser's comparables 2 and 5. Sale 2 is a CarMax with a lot size more than eight times that of the Subject's lot. There are no other auto dealerships in the

---

[9] When cross-examined why he did not use a 2018 land sale in Monmouth County (Eatontown) to a car dealership (Block 2401, Lot 54), plaintiff's appraiser responded it was because it was improved when sold. The Township's appraiser credibly rebutted this testimony by stating that he had used the sale as a comparable when appraising a neighboring property, thus personally knew that it was vacant land (10 acres), purchased for the development of an automobile dealership,

[10] Plaintiff's appraiser's report noted the household median income for Monmouth County per the 2000 census information was $64,271. The Township's appraiser's report noted that the 2019 household median income for the Township was $113,237.

comparable's vicinity. The appraiser agreed that CarMax purchases a car for a buyer from a wholesale market; Carmax, an auto mall by itself, sells several different brands of autos. He stated that the comparable's zone likely allowed for building car dealerships, but the court was provided with no evidence in this regard. Further, the lot size is considerable larger than the Subject and the court cannot agree with plaintiff's appraiser that such a disparity is irrelevant because the Subject is a car dealership.

Sale 5 is located in an industrial zone where uses are industrial and warehouse. It has no direct access to or from a highway. There was no evidence to show that car sales/dealerships are a permitted use. The Township's appraiser's undisputed rebuttal testimony was that the land was not a competitive use, and that the truck dealership was built to sell trucks to the warehouse occupants. Plaintiff's appraiser conceded that this was the least comparable vacant land sale.

The court rejects the Township's comparable Sales 3 and 4. Per plaintiff's appraiser's undisputed rebuttal testimony, Sale 3 included inventory and value for the franchise. Sale 4 was one of improved property. Although the appraiser deemed it vacant, and estimated $20 per SF for the existing improvements' contribution to land value (thus deducted $450,000 from the sale price), the evidence was that the buyer retained the improvements while seeking to expand on them, and post-sale obtained approvals for a 17,636 SF expansion "mostly of the showroom." Additionally, he was not able to verify whether the sale included non-realty aspects.

This leaves plaintiff's appraiser's Sales 1, 3, 4, and 6 and the Township's appraiser's Sales 1 and 2. Per plaintiff's appraiser's testimony, the buyer in Sale 3 was under pressure from a franchisor which wanted another car dealership in the vicinity, thus, had to choose one of two sites, therefore, bid more than a prior offer of $4,000,000. Plaintiff's appraiser agreed that the

12

buyer was "motivated." Demolition costs were not factored into the price. Therefore, the court does not consider Sale 3 as a credible comparable.

Plaintiff's appraiser's Sale 3, 4, and 6 were in zones where car dealerships were not a permitted or conditional use. So was the Township's appraiser's Sale 1.[11] Even if it is considered as "legally permissible" on the sale date because by then the buyer has obtained a use variance from the zoning requirements, it casts a shadow on the reliability of the sale price. The sale contract would account for contingency factors (length of time to obtain a use variance and costs associated with the risks of such contingency). This raises the issue whether the need to get a use variance renders the pre-negotiated sales price at-market when the sale closes. The Township's appraiser correctly recognizes this aspect when he notes that where properties are sold "subject to approvals," with the "buyer responsible for obtaining all approvals," it is anticipated that "the approval process can take several years," therefore, the sellers factor in the risk of approval denial and delayed closing dates by seeking higher sale prices. Without proof that the pre-negotiated sale price is the market price, it is not a credible indicator of market value. While the Township's appraiser attempted to adjust the sale price for this factor by -10%, the court finds it unsupported. How is the seller's risk, thus, alleged premium in the sales price, measured or compared for this allowance?[12] These sales are therefore rejected.

---

[11] See Eatontown Zoning Ordinance §89:44D(1)(22) ("new and used auto and recreational sales" is a permitted use in the M-B or Manufacturing Business Zone, not in the B-2 zone).

[12] This does not mean that the court will never accept such an adjustment. There may be a reasonable basis for reducing the sale price depending on the adduced proofs. See The Appraisal of Real Estate at 366, 376 ("Zoning is a basic criterion in selecting comparables. Sites zoned the same as the subject property generally have the same or similar" HBU, thus, "may be the most appropriate comparables," however, scarcity of sales in the "same zoning category" can justify using sales from a "similar zoning category" and if needed, adjustments can be made).

Plaintiff's appraiser's Sale 1 and the Township's appraiser's Sale 2 were in zones where the permitted uses included auto dealerships. It is irrelevant that the Township's appraiser's Sale 2 was intended for use as a supermarket because in the HBU analysis, a value in use is irrelevant. Similarly, it is irrelevant that the Township's appraiser agreed on cross-examination that land improved with a supermarket would have a different HBU than land improved by a car dealership. This is because the inquiry here is value of vacant land sales under the cost approach, not of improved sales under the sales comparison approach. As such, the court will use these two sales, with more emphasis on the latter, it being closer to the valuation date, and located in Monmouth County.

*Unit of Measurement*

The court finds a per-acre unit of measurement appropriate to the facts here. Plaintiff's appraiser agreed that for a car dealership, there is value in land because of parking needs and inventory storage, factors important to car dealerships. Yet, by using the floor-to-area (FAR) ratio, plaintiff's appraiser appears to be under-valuing or assigning no value to land. While FAR as a unit of measurement would be appropriate where the site is to be developed to maximize productivity of the buildable area, the court agrees with the Township's expert's opinion that a car dealership would not extend a building based on size of the land (such as here, the maximum FAR is 20% and the Subject's improvement is 13.96%).

*Appraisers' Adjustments*

Plaintiff's appraiser made no adjustments to his Sale 1, which the court has decided to use. However, he made an upward adjustment for entrepreneurial profit at 5% to his final land value conclusion because, he opined, car dealerships are owner-operated, and the "enterprise" of car dealerships is of real property and a "going business concern" plus service and maintenance

14

of automobiles to be sold and those sold. The appraiser noted that the owner/operator is an "entrepreneur" who/which "anticipates compensation for their efforts in the form of both return on the real property as well as a return from the business venture," and often, the expected return "on the business venture" is greater than the expected "return on the real property."

The court rejects this addition. It finds more persuasive the Township's arguments that entrepreneurial profit is provided for the project as a whole once it is completed which includes the development of realty as a whole, not piecemeal.

The Township's appraiser made five adjustments to his Sale 2, which this court has decided to use: demolition costs (+$25,000); zoning or "subject to approvals" (-10%); time (+2%); lack of approvals (which termed "zoning/approvals adjustment") (+35%); and size (+10% the comparable being 5.08 acres versus the Subject's 2.5 "useable" acres). All the adjustments are rejected.

The adjustment for "subject to approvals" (zoning) is unwarranted. The comparable was in a zone which permitted car dealerships. See Hazlet Zoning Ordinance Code §181-404.03.

The adjustment for market conditions is rejected due to the veracity of relying on data source: retail property sales for Northern New Jersey from CoStar for 2010-2019. It is unknown what type of properties CoStar considered as retail. Also unclear is whether the sales were improved or tenanted (the appraiser indicating that the "rate of increase in recent years is clearly extraordinary and is perhaps due to the sale of net leased properties"), when here the issue is sale of vacant land. Nor is it clear that sales in "Northern New Jersey" is the same as the local market in Monmouth County.

The court rejects the adjustment for size as there is no objective proof here that the principle of the economies of scale (small sells for more), should apply. Sales 1 and 2 used by

15

the Township's appraiser are of land measuring 4 acres and 5.08 acres and sold for $4,700,000 and $5,800,000 six months of each other in 2017. Their sale prices do not, per se, evidence that smaller lots sell for more, warranting an adjustment of +10%.[13]

Making an adjustment for lack of site plan approvals (approvals as to compliance with the zoning laws as to setbacks, building size, impervious coverage, and the like) is reasonable. Both appraisers agreed that property purchased with such approvals in place is worth more than one without. The question is the basis for the adjustment amount. There is nothing to show how the time and effort taken to obtain site plan approvals for improving the Township's appraiser's land sale 2 with a supermarket translates to 35% of the sale price, and would translate to 35% if site plan approvals were sought for improving the land with a car dealership as opposed to a supermarket. Therefore, the court rejects the +35% adjustment.

The lack of any underlying basis for the estimated $25,000 addback for demolition costs requires its rejection. While provision for such an expense is usually warranted, the amount provided is usually based on verification from the parties since "[t]hese costs are often quantified in price negotiations and can be discovered through verification of the sale transaction data." The Appraisal of Real Estate, at 412.[14]

In sum, the court must use the unadjusted sale prices of plaintiff's appraiser's Sale 1 and the Township's appraiser's sale 2. The per-acre price for each sale is $574,713 and $1,141,732. The court places most weight to the latter it being in Monmouth County and its sale date most proximate to the assessment date and finds the per-acre price as $950,000. The Township's

---

[13] The Township's appraiser's report notes that this is a "modest" adjustment "because the subject is potentially subdivideable." However, there was no discussion of the Subject's subdivision potential anywhere in the report or during testimony.

[14] Plaintiff's appraiser did not include an estimate of the demolition costs for his comparable Sale 1 since he did not verify the same.

appraiser estimated the Subject as having 0.5 acres of wetlands in the rear, therefore, only 2.5 acres was usable. The "geo map" shows a portion of Subject's property's lot line as encompassing a portion of a body of water. The aerial view of the Subject (using Google) shows the area abutting the parked vehicles in the rear as being surrounded by trees and foliage. However, there was no support for the non-useability of the estimated 0.5 acres. Was 0.5 acres officially declared to be "buffer" zones which should not be developed? Or was the buffer zone lesser? No zoning or other information was provided in this regard. Even if there was some type of official buffer, the question arises whether an adjustment should have been made for the Subject's alleged freshwater lands as opposed to deeming all 0.5 acres valueless, and if so what would be the amount of that adjustment? Without any of this information, the court is constrained to use 3 acres, which then provides for a total land value of $2,850,000.

(ii) Improvement Value

Both appraisers deemed the building as Class C Masonry of average condition and quality. Both relied on M&S cost data for deriving the replacement cost as new (RCN). Plaintiff's appraiser concluded the RCN for the main building and site improvements as $2,576,596 (including entrepreneurial profit). The Township's appraiser's RCN was $2,315,692 (with no entrepreneurial profit).[15] However, their respective conclusions of the *depreciated* RCN was $1,085,781 (plaintiff's appraiser) versus $1,750,000 (rounded) (Township's appraiser).

_____

[15] Plaintiff's appraiser used a slightly higher current cost multiplier (CCM) and local cost multiplier (LCM) to both the main building (1.05; 1.17) and site improvements (1.04; 1.17) than the Township's appraiser (1.02; 1.16 for base cost of building, and 1.01; 1.16 to site improvements). The LCM was for the City of Asbury Park, closest in area to the Subject.

The appraisers' base cost for the building also differed slightly ($88.29 PSF by plaintiff's appraiser based on M&S cost data as of December 2016 versus $94 PSF by the Township's appraiser based on M&S cost data as of February 2020 and December 2019). The latter however reduced the PSF cost by the M&S factor of 0.945 to "adjust the cost estimate back" to the valuation date, thus a "cost decrease of about 5.5% from current levels."

This was due to difference in physical depreciation for the building (45% versus 20%); for site improvements (65% versus 20%); functional obsolescence (10% versus zero); entrepreneurial profit (5% versus zero).

*Physical Depreciation for Building*

Both appraisers agreed that the building's chronological age was 28 years. They also agreed that the Subject's economic life was 40 years, per the M&S data for "complete auto dealerships," which both appraisers agreed are those with all components of a dealership such as sales, offices, and service areas.[16] Plaintiff's appraiser deemed the effective age as 18 years based on his personal inspection and the fact that there were no upgrades to the Subject except for construction of the arch in the façade. Thus, his depreciation under the age/life method was 45% (18÷40).

The Township's appraiser deemed the Subject's effective age as 15 years (since he estimated age in multiples of five) and used 20% per the December 2018 M&S depreciation table since, he stated, those were developed based on market reaction. The depreciation table attached to his report was for commercial properties which include some or all properties listed in sections 11-18 and 64 of the M&S data. "All" properties listed in Section 14 are included. Section 14 includes "complete auto dealerships" per plaintiff's appraiser addenda to his report showing base cost (as of February 2016). It is unclear which other properties are included in Section 14.

M&S' explanation of the physical depreciation tables notes that the "straight-line" age/life or "linear" method is an "accounting-type concept," which is simple but unrealistic.

---

[16] The 40 years life is reflected in the December 2018 M&S data, at Chapter 97, p.12, titled "Life Expectancy Guidelines – Typical Building Lives" for properties included in "Sections 14 & 44 – Garages, Industrials And Warehouses," provided to the court by the Township. Included in the list of buildings is "complete auto dealerships" and the life expectancy is based on condition and Class. Class C, average condition, and Classes D and S in "good and excellent" condition, are given 40 years of life expectancy.

Using a "constant" rate assumes "equal wear or serviceability each year" which is not necessarily true because (i) "passage of time may not itself" justify depreciation if the property is "well maintained and functionally sound," and (ii) it "fails to recognize any value-in-use."

Per M&S, a nonlinear approach is "the best approach" since it "is a combination of age and condition." This is the "extended life" theory which is that the older the building the "greater" is its "life expectancy." Although the building is older, periodic "correction of deficiencies may lower the effective age and lengthen the remaining life," which in turn "reverses a continuous progression down the effective age scale," which then reduces the depreciation rates. "This nonlinear approach accounts for a greater present value or slower depreciation rate in the early years as compared to the later years when diminishing serviceability and higher maintenance can accelerate depreciation."

M&S explains that its depreciation tables "were developed from actual case studies of sales and market value appraisals and formed the basis of the extended life theory which encompasses a remaining life and effective age approach." Land value was deducted from "confirmed sales prices" to obtain the building's value (residual approach), after which the RCN of that building was computed. The depreciation percentage was result of dividing the difference between the RCN "and the residual sales price" by the RCN. A "similar procedure" was used "with the market value appraisals, always excluding those observed cases having excessive obsolescence."

M&S then collated the data "by type of construction and usage, plotted with similar typical total life expectancies, with curves computed for the groupings, for which sufficient data was available, for statistical reliability." From this collation, it found "a matching family of empirical mathematical curves . . . from which the depreciation for any initial (when new) life

19

expectancy could be computed under normal market conditions." Depending on an appraised building's use and operations, "[t]he proper curve to use is . . . a matter of judgment on the part of the appraiser, considering the usage and the type of return normally expected, whether cash, equity or intangible amenities."

M&S instructs an appraiser to first determine the building's condition, "severity of use" by personal inspection; then its "true age;" then its effective age (by comparing the building with "like properties" and reviewing any maintenance, repair or modernization issues); then its life expectancy; and then apply the depreciation rate from the tables based on the type of property.

As noted above, both appraisers deemed the Subject's building to be in average condition. M&S defines this condition (in its explanation of Depreciation as of December 2018) as a building which shows "[s]ome evidence of deferred maintenance and normal obsolescence with age . . . [b]ut with all major components still functional and contributing toward an extended life expectancy." Further, the building's "effective age and utility are standard for like properties of its class and usage."

The M&S market extraction method is similar to the one explained in The Appraisal of Real Estate, 605, 608-10. However, as plaintiff correctly points out, M&S' data is usually national, therefore, it is unknown whether any local (state or county) factors were included in the data of complete auto dealerships. See id. at 605 (in using a "market extraction" method to estimate depreciation, although not essential, "it is desirable" to use "current" comparable sales of improved property which are "located in the subject property's area." Comparable sales "can be from a" comparable "market area" which is one with "similar tastes, preferences, and external influences"). Another issue is whether the extraction of building value from the sale price by M&S accounted for adjustments for non-realty items (franchise, goodwill, inventory), and if so

20

whether those adjustments are appropriate for a dealership such as the Subject. Ibid. (appraiser should make "appropriate adjustments to the comparable sale prices for certain factors, including property rights conveyed, financing, and conditions of sale" but not for market conditions or "physical, functional or external impairments"). Yet another issue is whether the RCN in the M&S data is computed as of the assessment date. See id. at 608 (appraiser should estimate the RCN "at the time of sale" of the comparable property).

These issues then render plaintiff's "simpler" age/life method of estimating depreciation more persuasive especially since the Subject has undergone no major renovation since 1989. The court will therefore use 45% for physical depreciation for the building.

*Functional Obsolescence*

Plaintiff's appraiser claimed that a 10% functional obsolescence provision is needed. His report explained this was due to outdated design, materials and layout and insufficient parking. He testified that new car dealerships typically now have a new car delivery area, an enclosed drive-through service lane, and a car wash. The Township's appraiser disagreed since the Subject was fully functional, well-maintained, and sufficient parking due to lease of the adjacent lot. The court agrees with the Township's appraiser and the photographs support his opinion.

*Entrepreneurial Profit*

Plaintiff's appraiser added 5% for entrepreneurial profit which the Township's appraiser felt was inappropriate since "[a]uto dealerships are typically built for owner occupancy, to provide the necessary spaces (showroom, service, administrative office, etc.) to operate a business" and not "built on 'spec.'" The court agrees with plaintiff's appraiser's provision. See Beneficial Facilities Corp. v. Borough of Peapack & Gladstone, 11 N.J. Tax 359, 381 (Tax 1990) ("Entrepreneurial profit is justified, even for an owner-constructed and owner-occupied building

21

because the principle of uniformity requires such property to be treated in the same manner as investment or speculation type property.") (citation omitted), aff'd, 13 N.J. Tax 112 (App. Div. 1992).

*Depreciated Cost of Site Improvements*

The court agrees with plaintiff's appraiser's use of M&S base costs for the building (as of February 2016) and site improvements (as of December 2015), the same being closer to the assessment date than the Township's appraiser's base costs which were as of February 2020 (building) and December 2019 (site improvements). The court also accepts plaintiff's appraiser's depreciation estimate for site improvements.

The resultant depreciated improvement RCN is $1,293,523 which plus $2,850,000 land value provides the Subject's value at $4,143,523 rounded to $4,143,525 (rounded).

**CONCLUSION**

The court finds the Subject's value is $4,143,525. Parties will inform the court on the application of the Chapter 123 ratio no later than March 26, 2021.

Very Truly Yours,

Mala Sundar, P.J.T.C.

22